IN THE UNITED STATES BANKRUPTCY COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| BRAXTON MANSEL GRAY and | ) | Case No. 05-61922 |
| KAREN JANE GRAY, | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |
| THOMAS J. O'NEAL, | ) | Adversary No. 06-6067 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JIM ARNOLD, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER DIRECTING JUDGMENT IN FAVOR OF PLAINTIFF

Thomas J. O'Neal, the Chapter 7 Trustee, filed an adversary action against Jim Arnold, seeking recovery of a transfer made by the Debtors to Arnold approximately ten months prior to the filing of their bankruptcy petition. The parties have stipulated to the facts and have stated to the court, via telephone conference, that they wish to submit the matter based solely on the stipulations and briefs they filed; neither party desires a hearing on the issues involved. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons that follow, judgment will be entered in favor of the Trustee.

Arnold and Debtor Braxton Gray are cousins. On April 29, 2002, Arnold loaned the Debtors $25,000 as evidenced by a promissory note signed by the Debtors. Under the terms of the note, all amounts were fully due and payable six months from the date of the note, October 29, 2002. The Debtors did not pay the note in full by October 29, 2002. However, on September 27, 2004, they paid Arnold $10,000, by cashier's check, in partial repayment of the note.[1]

Up to December 31, 2003, the Debtors operated a business known as Joplin Lighting Center. The business closed on that date. They filed their joint voluntary Chapter 7 bankruptcy petition on July 13, 2005, listing many of the business debts, which they had personally guaranteed or for which they were co-debtors, on their schedules.

The Trustee brought this action against Arnold, seeking recovery of the $10,000 payment as a preferential transfer under 11 U.S.C. §§ 547(b) and 550. Section 547(b) provides that a trustee may avoid any transfer of an interest of the debtor in property –

    (1)    to or for the benefit of a creditor;

    (2)    for or on account of an antecedent debt owed by the debtor before such transfer was made;

    (3)    made while the debtor was insolvent;

    (4)    made –

        (A) on or within 90 days before the date of the filing of the

---

[1] As of the date they filed their bankruptcy petition, the Debtors owed Arnold $12,950.13.

>   petition; or
>
>   (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> (5) that enables such creditor to receive more than such creditor would receive if –
>
>   (A) the case were a case under chapter 7 of this title;
>
>   (B) the transfer had not been made; and
>
>   (C) such creditor received payment of such debt to the extent provided by the provisions of this title.[2]

The parties concede that Arnold was a creditor, that the Debtors made the transfer on account of an antecedent debt, and that the payment enabled Arnold to receive more than he would have in a Chapter 7 liquidation, had the transfer not been made. They dispute only two elements of § 547(b), namely, whether Arnold was an "insider" of the Debtors, and whether the transfer was made while the Debtors were insolvent. The Trustee bears the burden of proving both elements by a preponderance of the evidence.[3]

### *Was Arnold an "Insider" of the Debtors?*

The term "insider" is defined in § 101(31), which provides, in relevant part:

> (31) The term "insider" includes –
>   (A) if the debtor is an individual –
>     (i) relative of the debtor or of a general partner of the debtor;
>     (ii) partnership in which the debtor is a general partner;
>     (iii) general partner of the debtor; or

---

[2] 11 U.S.C. § 547(b).

[3] *In re Ratner*, 332 B.R. 604, 607 (Bankr. W.D. Mo. 2005).

      (iv) corporation of which the debtor is a director, officer, or person in control.[4]

The term "relative" is defined in § 101(45) as an "individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree."[5]

  The parties do not dispute that Arnold is related to the Debtors in that Arnold and Debtor Braxton Gray have a common ancestor, but they dispute whether they are related within the third degree under Missouri's common law. Missouri utilizes two methods for determining degrees of consanguinity. According to the Missouri Supreme Court:

> There are two methods of reckoning degrees of consanguinity: The canon law, and the civil law. Under the canon law the number of generations is counted from the common ancestor down to the *farthest* of the two descendants whose degree of relationship is to be ascertained. Under the civil law the count *ascends* by generations from either of the two relatives to the common ancestor and thence down the collateral line to the other. The reckoning by civil law would be just double that under the canon law, as applied to relatives removed an equal number of generations from the common ancestor.[6]

  Arnold and Debtor Braxton Gray are first cousins, once removed, as evidenced in the following chart:



James E. Arnold

---

[4] 11 U.S.C. § 101(31).

[5] 11 U.S.C. § 101(45).

[6] *State v. Thomas*, 174 S.W.2d 337, 340 (Mo. 1943).



The parties thus agree that, under the canon law method, Arnold and Braxton Gray are related in the third degree, but under the civil law method, they are related in the fifth degree. Hence, if we apply the canon law method, Arnold is a "relative" of the Debtors under the Code's definition; if we apply the civil law method, he is not. Thus, the determinative question is which of the two methods is appropriate in determining who is an "insider" for preference avoidance purposes.

The Trustee asserts this court should utilize the canon law approach. In *State v. Thomas,* the Missouri Supreme Court determined that the canon law approach was appropriate in determining whether a venireperson is related within the fourth degree to a party in a civil case.[7] In 1995, the Missouri Court of Appeals reenforced this holding in *Sommers v. Wood*.[8]

Arnold asserts this court should use the civil law approach, relying on *In re Hydraulic*

---

[7] *Id.* at 341.

[8] *Sommers v. Wood*, 895 S.W.2d 622 (Mo. Ct. App. 1995) (canon law applies in determining whether a venireperson is related within the fourth degree to a party in a civil case); *see also Gordon v. Oidtman*, 692 S.W.2d 349 (Mo. Ct. App. 1985) (canon law is applied in civil jury cases).

*Industrial Products Co.,*[9] which appears to be the only bankruptcy case in Missouri addressing this issue. The court in that case applied § 474.010 of the Missouri Statutes, which is Missouri's statutory descent and distribution law, to determine whether a person was a relative of the debtor under the Bankruptcy Code. Under § 474.010, consanguinity is determined using the civil law method.[10] Thus, the *Hydraulic Industrial* court held, the first cousins in that case were not within the third degree and, thus, not within the definition of "relative" in the bankruptcy context.[11]

I respectfully disagree with the *Hydraulic Industrial* court's conclusion that the civil law method should be used in determining whether a transferee is a "relative" of the debtor for preference avoidance purposes. As the *Hydraulic Industrial* court notes, there is little legislative history as to what Congress intended by referring to the term "common law" in § 101(45).[12] That phrase has several meanings,[13] but in terms of consanguinity, most

---

[9] *DeWoskin v. Brady (In re Hydraulic Indus. Prods. Co.)*, 101 B.R. 107 (Bankr. E.D. Mo. 1989).

[10] Mo. Rev. Stat. Ann. § 474.010(1)(d).

[11] *In re Hydraulic Industrial Prods*, 101 B.R. at 109. The court went on, however, to say that, even though first cousins are not "relatives" within the Bankruptcy Code's definition, the definition of "insider" is not limited to the examples listed in § 101(31), and that there was an issue of fact regarding whether the parties a had sufficiently close relationship with each other that closer scrutiny was warranted to determine whether the defendant was an "insider." *Id.* Hence, if Arnold were correct that he is not a "relative" of the Debtors, the Trustee would then be required to demonstrate that Arnold was nevertheless an "insider" due to his ability to influence the Debtors' payment to him.

[12] *Id.*

[13] *See, generally,* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 177-78 (2d ed. 1995).

commentators associate the canon law approach with the phrase "common law."[14]

In conformity with the premise that the canon law is often referred to as the "common law," the *Hydraulic Industrial* court mentioned, and briefly described, Missouri's canon law, specifically referring it as "the common law method."[15]  The court went on, however, to say that "in Missouri, the common law is the law of the land unless it is abrogated by the Constitution or by statute," and since the trustee in that case did not provide any authority to support the proposition that the canon law method should be used notwithstanding the enactment of § 474.010 (which applied the civil law method), the civil law method should be used.[16]  However, as discussed above, Missouri continues to apply the canon law, at least in the context of juror disqualification in civil cases,[17] and so Missouri's canon law has not been abrogated by § 474.010, except in the context of descent and distribution.  Hence, both approaches continue to be viable in Missouri.

Thus, the question is, which of the two approaches better conforms with the purpose of § 547, which is to equalize the distribution scheme among similarly situated creditors.[18]  Transfers to insiders are subject to particular scrutiny via § 547(b)(4)(B)'s longer look-back period because of the perception that insiders have special influence over debtors and are

---

[14] *See, e.g.,* 23 Am.Jur.2d, *Descent and Distribution* § 72 (2002).

[15] 101 B.R. at 109.

[16] *Id.*

[17] *Sommers v. Wood*, 895 S.W.2d at 623.

[18] *In re Libby Intern., Inc.*, 247 B.R. 463, 470 (B.A.P. 8th Cir. 2000).

more likely to receive unfairly advantageous distributions. Section 547 is intended to remedy that advantage and level the playing field among creditors. In my view, when the debtor and creditor are as closely related as cousins, the debtor is likely to be influenced by the family, thereby creating an advantage.

In addition, I find the *Hydraulic Industrial* court's marriage of § 101(45)'s "third degree" language with the civil law approach to be incompatible in this context. Although the two approaches use different methodologies for calculating the number of so-called degrees, the practical application of the civil law and the canon law in Missouri often results in the prohibited relationship being similar under both approaches. In other words, because the civil law requires counting up one line and back down the other, whereas the canon law only counts up one line to the common ancestor, the level of forbidden consanguinity under the civil law is usually about double the number of degrees than that of the canon law.[19] Thus, the level of prohibited relationship is adjusted accordingly. For example, in civil lawsuits in Missouri, jurors are disqualified from serving if they are related to a party within the fourth degree under the canon law method.[20] In criminal cases, jurors are disqualified from serving if they are related to the defendant in the ninth degree under the civil law

---

[19] *State v. Thomas*, 174 S.W.2d at 340 ("The reckoning by civil law would be just double that under the canon law, as applied to relatives removed from an equal number of generations from the common ancestor. Thus, brothers would be related in the 1st degree under the canon law, and in the 2nd degree under the civil law; first cousins similarly in the 2nd and 4th degrees; second cousins in the 3rd and 6th degrees, etc. But the child of one of two first cousins . . . would be related to the other cousin in the 3rd or 5th degree, respectively, because one generation [is] further removed from the common ancestor.").

[20] *Id.*

method.[21]   Similarly, § 474.010, limits intestate distributions to relatives within the ninth degree under the civil law method.[22]

In sum, the interpretation urged by Arnold here, applying the "third degree" language to the civil law, results in an overly narrow definition of "relative" for preference avoidance purposes.  Applying the canon law, as opposed to the civil law approach (which would place even first cousins outside of the definition of "insider") better conforms with § 547's purpose.[23]  Accordingly, because I interpret § 101(45)'s reference to "common law" to mean the canon law method for determining consanguinity, Arnold is a "relative" and an "insider" of Debtor Braxton Gray.

As to Debtor Karen Gray, the definition of "relative" also includes those related by "affinity" in the third degree.

> Affinity is defined as a legal relationship which arises as the result of marriage between each spouse and the consanguineal relatives of the other.  That is, the husband is related by affinity to his wife's relatives in the same way that she is related to them by blood, and she is related to his relatives by affinity in the same way that he is related to them by blood.[24]

---

[21]  *Id.*

[22]  Mo. Rev. Stat. Ann. § 474.010.

[23]  *See also In re Cloverleaf Farmer's Co-Operative*, 114 B.R. 1010 (Bankr. D. S.D. 1990) (expressly adopting the canon law approach, rather than the civil law approach, in determining whether a debtor qualified as a family farmer; holding that this "single count common law technique applies [§ 101(45)'s] express language, yields uniform law nationwide, and promotes Congress' policy"); *In re Covey*, 57 B.R. 665, (Bankr. D. S.D. 1986) (relying on Am.Jur.'s descent and distribution discussion and holding that degrees of kinship under the common law are computed by counting the number of generations from the nearest common ancestor).

[24]  *Sommers v. Wood,* 895 S.W.2d at 623.

Accordingly, since Arnold is a "relative" of Braxton Gray, and Karen Gray is Braxton Gray's wife, Arnold is also a relative, and thus an insider, of Debtor Karen Gray.

### *Were the Debtors Insolvent on the Date of the Transfer?*

The relevant date regarding the Debtors' insolvency is the date of the transfer, September 27, 2004. Although the Debtors' bankruptcy schedules were filed ten months after that date, the parties concede that the schedules, along with the Statement of Financial Affairs, are a reasonably accurate reflection of the Debtors' financial condition as of September 27, 2004, particularly because the vast majority of their debts stem from personal guarantees or co-debtor obligations on the debts of their business, Joplin Lighting Center, which closed on December 31, 2003. Neither side offered any other evidence as to the issue of the Debtors' insolvency as of the relevant date.

According to the schedules, the Debtors own their residence, which they value at $81,780, and have personal property valued at $18,682.65. They have one secured debt of $67,997.98, secured by a deed of trust on their home. They have no priority unsecured debt, and $403,253.28 in general unsecured debt. Hence, the Debtors's schedules show assets of approximately $100,000, and debts of approximately $471,000, leaving them in the red by about $371,000.

Arnold points to the Statement of Financial Affairs, however, which shows that the Debtors sold two parcels of real estate in the weeks just before the transfer to Arnold. On September 10, 2004, the Debtors sold a farm located in Greene County, Missouri, for $169,434.68, which had been subject to a mortgage in the amount of $44,895.54. And, on

September 20, 2004, they sold a house in Webb City, Missouri, for $105,000, which had been subject to a mortgage of approximately $96,800. Thus, as of about a week prior to the transfer to Arnold, the Debtors presumably had approximately $133,000 in net proceeds from the sale of the real estate. However, even adding that amount to the $100,000 in other assets, meaning they had $233,000 in total assets as of the date of the transfer, their debts were $471,000, still rendering them insolvent by about $238,000 after the sale of the real estate. Arnold asserts that, after the sales of the real estate, the Debtors had substantial "liquidity" at the time of the transfer. However, liquidity is not the same as solvency. I find, therefore, that the Debtors were insolvent at the time of the transfer to Arnold.

### *Conclusion*

ACCORDINGLY, I find that the Trustee has met his burden of proving that Defendant Jim Arnold was an insider of the Debtors and that the Debtors were insolvent at the time of the $10,000 transfer to Arnold on September 27, 2004. Because the parties conceded all other elements of § 547(b), the transfer was a preferential transfer subject to avoidance under §§ 547 and 550 of the Bankruptcy Court. IT IS HEREBY ORDERED that the Clerk of Court shall enter judgment in favor of the Trustee in the amount of $10,000. Each party to bear its own costs.

IT IS SO ORDERED.

                                              /s/ Arthur B. Federman
                                                 Bankruptcy Judge

Date: November 14, 2006

Copy to: Thomas J. O'Neal
　　　　　Erin E. Willis